UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CIVIL ACTION NO. 4:17-CV-00101-JHM

TIMOTHY MCQUAY                                                                                             PLAINTIFF

VS.

TENNESSEE VALLEY AUTHORITY
and INLAND MARINE SERVICE, INC.                                                    DEFENDANTS

## MEMORANDUM OPINION AND ORDER

### BACKGROUND

This discovery dispute between Defendants Tennessee Valley Authority ("TVA") and Inland Marine Service, Inc. ("IMS") concerns recorded crewmember statements taken by IMS's outside counsel following the accident that occurred on September 23, 2014. TVA seeks an order directing IMS to produce the recorded statements. This matter is ripe for determination. For the reasons set forth below, the undersigned concludes that the recorded statements are subject to the attorney-client privilege and, therefore, not discoverable.

### NATURE OF THE MOTION

The accident at issue occurred on September 23, 2014. (DN 7, Amended Complaint, ¶8). Plaintiff Timothy McQuay was working for IMS as a deckhand on the M/V Betty Feagin (Id.). The M/V Betty Feagin was delivering a loaded coal barge to the off loader at the TVA Paradise Fossil Plant on the Green River (Id.). During that process, the TVA operator lowered the haul wire and McQuay placed the eye of the haul wire over a timberhead on the starboard stern of the barge (Id.). McQuay then turned and moved toward the port side of the barge to remove the port

face wire that connected the barge to the towboat (DN 7, Amended Complaint, ¶8; DN1-1, McQuay depo. at 72-73). Within seconds, however, the haul wire suddenly became taught and the eye of the haul wire broke apart in a whipping action, striking McQuay's left lower leg (Id.). Emergency medical services took McQuay to a hospital where he underwent surgery to repair his severely injured left lower leg (Id.). On the evening of September 24, 2014, Jay D. Patton, an attorney with the law firm Schroeder Maundrell Barbiere & Powers ("SMB&P") boarded the M/V Betty Feagin after informing the crewmembers that he represented IMS. Mr. Patton recorded the crewmembers' statements regarding the incident. TVA sought these recorded statements through discovery, IMS objected.

At the request of counsel, the undersigned conducted a telephonic conference on June 26, 2018, to discuss this discovery dispute (DN 87). Counsel for Plaintiff, TVA, and IMS participated (Id.). Prior to the telephonic conference, counsel for TVA and IMS submitted emails expressing their positions on whether the work product doctrine applied to the recorded statements and, if so, whether the recordings were nevertheless discoverable. *See* Fed. R. Civ. P. 26(b)(3)(A). As a result of discussion during the telephonic conference, the undersigned directed IMS to submit the recorded statements directly to the undersigned for an *in camera* review (Id.). IMS submitted transcripts of the recorded statements by email (Id.).

On July 10, 2018, the undersigned conducted an in-person hearing at the United States Courthouse in Bowling Green, Kentucky (DN 88). Participating in the conference were attorneys Lane E. McCarty and Jill E. McCook for TVA and attorneys Todd M. Powers and Jay D. Patton for IMS (Id.). During the hearing counsel for IMS explained that they are also asserting the attorney-client privilege applies the recorded statements (Id.). At the close of the hearing, the undersigned directed counsel for TVA and IMS to simultaneously file briefs on July 24th and

responses 21 days later (Id.). A transcript of the hearing is filed in the record (DN 89). Counsel for TVA and IMS have filed their briefs and responses (DN 91, 93, 94, 95).

During the July 10, 2018 in-person conference, Todd M. Powers, lead trial counsel for IMS in this case, reported that he has represented IMS for over 30 years and is the direct contact between his law firm, SMB&P, and IMS (DN 89 Hearing Transcript at PageID # 486-88, 493-95, 497, 501). Mr. Powers advised that shortly after the September 23, 2014 accident, IMS's President, David Hammond, Jr., called Mr. Powers and described the location of the vessel and generally what he understood might have happened (Id.). This information included the apparent severity of the incident, including the fact that McQuay had been taken for surgery by helicopter with a serious leg injury (Id.). The call included a discussion of whether it would be appropriate for one of the attorneys in Mr. Powers' firm to travel to the boat to investigate the incident and take statements from the crewmembers (Id.). Following that discussion, Mr. Hammond directed Mr. Powers to send an attorney to the vessel for those purposes (Id.). Specifically, Mr. Hammond requested that SMB&P, following the investigation, provide IMS with direction as to (1) whether a limitation of liability action pursuant to 46 U.S.C. § 30505 would be appropriate, (2) whether IMS could recover medical expenses paid on behalf of Plaintiff from the landing owner (TVA); and (3) whether IMS would likely be sued in connection with the incident, and the extent of IMS's liability exposure, if any (Id.).

Due to Mr. Powers' unavailability, he contacted his law partner, Mr. Patton, and instructed him to proceed to the vessel, on the Green River in Kentucky, to begin the investigation and take the statements (DN 89 PageID # 493-495). On the way, Mr. Patton spoke by phone to IMS vice-president Craig Burrus (Id.). During that conversation, proposed areas of questioning of the crew members were developed and refined (Id.). IMS informed the Captain or Pilot of the M/V Betty

3

Feagin that a lawyer for IMS would be boarding the vessel to conduct an investigation and take statements (Id.). On the evening of September 24, 2014, Mr. Patton arrived aboard the M/V Betty Feagin (Id.). Upon meeting each of the crew members aboard the vessel, Mr. Patton explained that he represented IMS before taking their statements (Id.). Mr. Patton understood the purpose of recording the statements was to assess whether someone, other than IMS, was potentially responsible for McQuay's injury (Id.).

Mr. Powers advised that the recorded statements were intended to discover facts necessary to advise IMS as to whether any entity other than IMS bore any legal liability for McQuay's injury, whether IMS faced liability for the incident, and whether a limitation defense may be appropriate (DN 89 PageID # 493-95, 497, 499, 501). Following the taking of the statements, the facts were summarized in a letter to IMS along with an evaluation of potential exposure and recommendations as to future legal handling (Id.). As a further result of the investigation, SMB&P had additional communications with IMS, which included further legal advice (Id.). The recorded statements were transcribed by SMB&P support staff (Id.). They have been stored in SMB&P's legal file at SMB&P's law office (Id.). The statements have not been transmitted to IMS or given, in any form, to the crewmembers themselves or the Coast Guard (Id. at PageID # 497, 499, 504-05).

Mr. Powers advised that IMS does not have a policy of having an attorney investigate and take crew statements every time there is a crewmember injury (DN 89 PageID # 488-93, 497-98). In fact, when McQuay, sustained his second injury on November 20, 2015, no attorneys were involved (Id.). Mr. Powers indicated that IMS does have a policy that its employees fill out an incident report for every injury that occurs on its vessels and complete a CG-2692 Report of Marine Casualty when required (Id.). In connection with the September 23, 2014 and November 20, 2015 incidents, IMS employees, without the participation of attorneys, took a statement from McQuay

4

and completed the CG-2692 reports (Id. PageID # 488-89). Copies of both incident reports and both CG-2692 reports have been produced to McQuay and TVA in discovery (Id.). Mr. Powers indicated that IMS's practice is to involve attorneys only in a very low percentage of cases where IMS decides the incident is likely to result in litigation or IMS needs legal advice regarding how best to respond to the incident (Id.).

After Mr. Patton completed his investigation, he talked with Mr. Powers and they talked with IMS (DN 89 PageID # 489). Mr. Powers sent a letter[1] to TVA on September 25, 2014 (Id. and DN 93-2 Copy of Letter). The letter put TVA on notice that IMS was holding it responsible for the September 23, 2014 incident and asked TVA to preserve evidence (Id.).

On September 25, 2014, SMB&P notified the Coast Guard by email that it would be representing IMS and the crew of the Betty Feagin (except for McQuay) in connection with the Coast Guard's investigation (DN 91-1). Additionally, SMB&P advised the Coast Guard that IMS requested it be designated a party in interest and that its attorneys be permitted to attend any interviews conducted and to review any evidence gathered by the Coast Guard in its investigation (Id.). Finally, SMB&P acknowledged the Coast Guard's desire to interview the Captain, the pilot, and the other deckhand (Id.). SMB&P indicated it would produce these crewmembers by telephone and insisted that the Coast Guard not record the interviews (Id.). The Coast Guard did not record the crewmembers' statements during those interviews (DN 89 PageID # 491-92).

During the July 10, 2018 in-person conference, Mr. Powers pointed out that TVA elected not to participate, as a party in interest, in the Coast Guard's investigation (DN 89 PageID # 490).

---

1 Mr. Powers thought the letter was attached to an email to TVA (DN 89 PageID # 489).

Mr. Powers explained that if TVA had elected to participate, as a party in interest, it could have been present for and asked questions during the Coast Guard's interviews of the crewmembers (Id.).

Mr. Powers explained that the focus of a Coast Guard investigation is whether there has been a violation of any Coast Guard regulations, whether any procedural recommendations should be made, and whether to take action against a vessel company's license (Id. PageID # 492-93). Sometimes IMS attorneys have arrived at a vessel while the Coast Guard is conducting its investigation (Id.). When this happens, the attorney might facilitate the Coast Guard's request for a written statement from a crewmember (Id.). Mr. Powers indicated "[i]n this case that's not what happened" (Id. PageID # 493).

Mr. Powers indicated that the Coast Guard asked for a written statement from Captain Chin and "that was given without our involvement" (DN 89 PageID # 493). The written statement has been produced in discovery (Id.; DN 93-5). On October 2, 2014, Mr. Patton facilitated and participated in the Coast Guard's telephonic interview of the two eyewitness employees, the Pilot Kenneth Anderson and the deckhand Neadem Benefield (DN 89 PageID # 491, 493; DN 93-3 and 93-4; DN 94-2 PageID 643-44). Mr. Powers also pointed out that following the investigation, the Coast Guard issued a report with attached summaries of what the crewmembers said during their interviews (DN 89 PageID # 490).

Ms. McCarty advised that the Coast Guard's records indicate it was notified of the incident on September 25, 2014 (DN 89 PageID # 496-98). Mr. Powers advised that IMS, like every river company, requires an incident report be filled out by someone on the crew to confirm the circumstances of the injury or incident (Id.; DN 94-2 PageID 645). Mr. Powers indicated that IMS "never comes to us unless the company decides this is an issue that may end in litigation or this is

6

something that they need our input as to what to do" (DN 89 PageID # 498). Mr. Powers explained that a very low percentage of incident reports turn out to be something that his or some law firm investigates (Id.). His firm is not involved in every incident where IMS pays maintenance and cure because it is routinely paid for most injuries or incidents that happen aboard vessels (Id. PageID # 499-501). Mr. Powers advised that there was not a question as to whether McQuay was entitled to maintenance and cure for the incident on September 23, 2014 (Id.).

Mr. Powers indicated that the issues were whether there may be a claim available to recover that money from a third-party and, with regard to the prospect of litigation, what are the defenses ((DN 89 PageID # 501-). One of the things that Mr. Patton was trying to determine was whether there had been an equipment failure (Id.). As a result, Mr. Patton focused his attention on what the crewmembers normally do and what could have caused the wire to break because they did not have the ability to inspect the equipment as it was immediately repaired by TVA employees so the unloading operation could continue (Id.).

## ARGUMENTS OF THE PARTIES

1. TVA's Memorandum

TVA asserts that the proffer by IMS's counsel during the July 10 hearing failed to show Mr. Patton recorded the crewmember statements "because of" a subjective anticipation of litigation that was objectively reasonable (DN 91 PageID # 516-18, 521-25, citing United States v. Roxworthy, 457 F.3d 590, 593 (6th Cir. 2006)). TVA contends that the proffer instead showed the crewmember statements were recorded in the ordinary course of IMS's business as part of its duty to report a marine casualty to the United States Coast Guard and facilitate the Coast Guard's own investigation (Id. citing 46 C.F.R. § 4.05-1(a)(6)).[2] If the Court determines the recorded

---

2 TVA suggests that had IMS immediately notified the Coast Guard of the September 23, 2014 incident, it is likely that the Coast Guard would have been present at the vessel when Mr. Patton recorded the crewmember statements

7

statements are work product, TVA argues the statements are ordinary rather than opinion work product and are discoverable because it has a substantial need for the material as TVA has no eyewitness accounts and almost four years have passed since the accident; and there is no way for TVA to obtain the substantial equivalent of the nearly contemporaneous statements given by the crew members, which likely contain information that no deposition could bring out (DN 91 PageID # 525-27 and n. 7, citing Fed. R. Civ. P. 26(b)(3) and Howard v. Fowler Bros., Inc. No. 5:10-CV-198, 2011 WL 3438407, at *2 (W.D. Ky. Aug. 5, 2011)).³

TVA asserts that IMS has waived its newly raised claim of attorney-client privilege by failing to raise it in the first privilege log and its email communication to the Court summarizing the discovery dispute (DN 91 PageID # 528-30). Alternatively, TVA argues the conclusory descriptions in IMS's amended privilege log, emailed to TVA the day after the hearing, are insufficient to meet IMS's burden (Id. citing DN 91-5 Exhibit 5 and In re Search Warrant Executed at Law Offices of Stephen Garea, No. 97-4112, 1999 WL 137499, at *1-2 (6th Cir. Mar. 5, 1999)). TVA also asserts that IMS has failed to demonstrate that the crewmembers were directed by a superior to speak with IMS's counsel and knew they were being interviewed by IMS's counsel so that IMS could obtain legal advice (DN 91 PageID # 528-30, citing Upjohn Co. v. United States, 449 U.S. 383, 394-96 (1981) and In re Perrigo Co., 128 F.3d 430, 437 (6th Cir. 1997)).

2. IMS's Memorandum

IMS asserts that the proffer on July 10 demonstrates the recorded crewmember statements are exempt from disclosure under the attorney-client privilege because they are confidential

---

(Id.). TVA points out that IMS first notified the Coast Guard about the incident by fax on September 24, and the nature of the incident-a reportable marine casualty requiring medical treatment-was not confirmed to the Coast Guard until the afternoon of September 25 (DN 91 PageID # 516-18, 521-25).

3 If the Court determines that portions of the recorded statements contain information that reflects the legal impressions, theories, or strategies of IMS's counsel, TVA requests that the Court redact those portions and order the factual portions of the recorded statements be produced as non-work product (DN 91 PageID # 527).

communications from IMS's employees to IMS's attorney, made at the direction of IMS corporate superiors, in connection with the provision of legal advice to IMS and in the context of an attorney-client relationship between IMS and SMB&P (DN 93 PageID # 576-80, citing Upjohn, 449 U.S. at 389-95). Alternatively, IMS argues the proffer on July 10 provided sufficient information to conclude that IMS's counsel recorded the crewmember statements "because of the prospect of litigation" and, therefore, the recorded statements are protected from disclosure under the work product doctrine (Id. PageID # 580-85, citing United States v. Roxworthy, 457 F.3d 590, 593 (6th Cir. 2006)). If the Court concludes that the recorded statements do not reflect an attorney's mental impressions, IMS asserts TVA cannot establish substantial need for the statements or that it is unable without undue hardship to obtain the substantial equivalent by other means (Id. PageID # 585-90, citing Cobble v. Value City Furniture, No. 3:06-CV-631, 2008 WL 114937, at *2 (W.D. Ky. Jan. 10, 2008) and Hodges Grant & Kaufmann v. U. S. Gov't, Dep't of the Treasury, 768 F.2d 719, 721 (5th Cir. 1985)). If the Court finds the recorded statements are discoverable, it should limit the production to the crewmembers' descriptions of their actions and observations during the incident because opinion work product can be found in counsel's questions to the crewmembers, their descriptions of the facility, their descriptions of the way the operation was ordinarily performed, and their theory as to possible causes of the incident (Id. PageID # 590-91).

    3. TVA's Response

TVA asserts that IMS has failed to demonstrate the crewmembers were informed that they were providing the information for IMS to secure legal advice and their communications to counsel were considered confidential when made and kept confidential (DN 94 PageID # 613-15, citing Upjohn, 449 U.S. at 394-95). TVA reiterates its position that IMS has not sustained its burden of demonstrating the crewmember statements were recorded "because of" the prospect of litigation

(Id. PageID # 615-17, citing Wheat v. M. Matt Durand, LLC, No. 13-5068, 2014 WL 7339023, at *3 (E.D. La. Dec. 22, 2014) (investigation and evaluation of accidents is part of the regular, ordinary, and principal business of maritime companies)). Assuming the statements qualify for work product protection, TVA asserts that the Court should order them produced because almost four years have passed since the incident and TVA has a substantial need for the near-contemporaneous statements in preparation of its case because the recent depositions of Pilot Anderson and Deckhand Harris show they both have suffered memory loss about the incident (Id. PageID # 617- , citing Fed. R. Civ. P. 26(b)(3)). Additionally, TVA asserts that those statements, TVA is unable, without undue hardship, to discern how the crewmembers' initial recollections of the incident might have changed due to fading memories and impeach their testimony at trial (Id. PageID # 617-21, citing Fed. R. Civ. P. 26(b)(3)).

    4. IMS's Response

IMS asserts that it has not waived the ability to assert the attorney-client privilege in connection with the recorded crew statements (DN 95 PageID # 654-57). IMS indicates that the crewmembers were "sufficiently aware" that they were being questioned in order that IMS could obtain legal advice (Id., citing Upjohn, 449 U.S. at 394). IMS reiterates its position that the recorded crew statements are exempt from disclosure under the work product doctrine "because of" a genuine prospect of litigation (Id. PageID # 657-664, citing Fed. R. Civ. P. 26(b)(3) and Roxworthy, 457 F.3d at 593-94). IMS argues that TVA cannot establish a substantial need for the recorded statements or that it is unable without undue hardship to obtain the substantial equivalent by other means (Id. PageID # 664-666).

DISCUSSION

The Court will address first the issue of whether the attorney-client privilege applies to the recorded statements of the crewmembers. The attorney-client privilege "is the oldest of the privileges for confidential communications known to the common law." Upjohn Co. v. United States, 449 U.S. 383, 389, (1981) (citations omitted). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Id.; Hunt v. Blackburn, 128 U.S. 464, 470 (1888). The privilege exists to protect not only the giving of professional advice by the lawyer but also the giving of information by the client to enable the lawyer to give sound and informed advice to the client. Upjohn, 449 U.S. at 390.

The Court will apply federal common law on privilege because this is a federal question case. See Reed v. Baxter, 134 F.3d 351, 355 (6th Cir. 1998) (citing Fed.R.Evid. 501). Since IMS is the party asserting the attorney-client privilege, it has the burden of demonstrating the applicability of the privilege to the recorded statements of the crewmembers. See In re Grand Jury Investigation No. 83-2-35, 723 F.2d 447, 450 (6th Cir. 1983); In re OM Securities Litigation, 226 F.R.D. 579, 590 (N.D. Ohio 2005). The question of whether the attorney-client privilege applies to these recorded statements is a mixed question of law and fact. See Reed, 134 F.3d at 355-56.

Courts applying federal common law often articulate the elements of the attorney-client privilege as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived.

11

Reed, 134 F.3d at 355–356 (citations omitted). However, these elements apply to only a portion of the confidential communications that courts have deemed subject to the attorney-client privilege. For example, the privilege applies to confidential communications from counsel to client that set forth legal advice or reveal the substance of the client confidence. United States v. Defazio, 899 F.2d 626, 635 (7th Cir.1990) (citations omitted); Bank Brussels Lambert v. Credit Lyonnais, 160 F.R.D. 437, 441–442 (S.D.N.Y.1995) (citations omitted). Additionally, confidential communications made by mid and lower level corporate employees to counsel for the corporation can be subject to the attorney-client privilege. *See* Upjohn, 449 U.S. at 394.

In Upjohn, at the direction of the Chairman of the board, the corporation's General Counsel and outside counsel conducted an internal investigation into the nature and magnitude of any possibly illegal payments made by managers of Upjohn or any of its subsidiaries to any employee or official of a foreign government to secure that government's business. Id. at 386. General Counsel and outside counsel conducted the investigation by directing all foreign general and area managers to respond to written questionnaires that sought detailed information concerning such payments. Id. at 387. The managers were instructed to treat the investigation as highly confidential and not to discuss it with anyone other than Upjohn employees who might be helpful in providing the requested information. Id. Responses were to be sent directly to the corporation's General Counsel. Id. General Counsel and outside counsel then interviewed the recipients of the questionnaire and some 33 other officers or employees of the corporation as part of the investigation. Id. The corporation then voluntarily submitted a preliminary report to the Securities and Exchange Commission and, simultaneously, submitted a copy to the IRS which began an investigation to determine the tax consequences of the payments. Id.

The IRS issued a summons, pursuant to 26 U.S.C. § 7602, demanding production of several items, including the questionnaires and any memorandums or notes of the interviews. Id. at 387-88. Upjohn declined to produce the questionnaires and memorandums or notes of the interviews claiming they were subject to the attorney-client privilege. Id. at 388. The district court adopted the Magistrate Judge's recommendation that the summons should be enforced. Id. On appeal, the Sixth Circuit rejected the Magistrate Judge's finding of a waiver of the attorney-client privilege. Id. The Sixth Circuit concluded that the attorney-client privilege applied only to the communications made by officers and agents of Upjohn who were responsible for directing the corporation's actions in response to counsel's legal advice, the "control group" of corporate officials. Id. at 388-90.

The Supreme Court noted that the "control group" view overlooked "the fact that the attorney-client privilege exists to protect not only the giving of professional advice to those who can act on it, but also the giving of information to the lawyer to enable him to give sound informed advice." Id. at 390 (citing Trammel v. United States, 445 U.S. 40, 51 (1980)). The Supreme Court pointed out that it will frequently be mid and lower level employees who are beyond the control group of officers and agents that, by actions within the scope of their employment, will possess the relevant information needed by the corporation's lawyer to adequately advise the client with respect to legal matters. Upjohn, 449 U.S. at 391-92. The Supreme Court explained that the control group test adopted by the Sixth Circuit "thus frustrates the very purpose of the privilege by discouraging the communication of relevant information by employees of the client to attorneys seeking to render legal advice to the client corporation." Id. at 392.

The Supreme Court applied the attorney-client privilege to the confidential communications made by Upjohn's mid and lower level employees to counsel for Upjohn because

13

the communications were made at the direction of their superiors to secure legal advice from counsel. Further, these confidential communications were about matters within the scope of the employee's corporate duties and the employees themselves were sufficiently aware that they were being questioned in order for Upjohn to obtain legal advice form counsel. 449 U.S. at 394. Further, the Supreme Court noted that pursuant to explicit instructions by the Chairman of the Board, these communications were considered highly confidential when made and have been kept confidential by the company. Id.

The Court will now apply the sound reasoning of the Supreme Court in Upjohn to the relevant information in this case. Relying upon information provided during counsels' proffer on July 10, 2018 and deduced from an *in camera* review of the transcripts of the recorded crewmember statements, the Court finds that the communications at issue were made by IMS employees to counsel for IMS, at the direction of corporate superiors at IMS, in order to secure legal advice from counsel. While corporate superiors at IMS conveyed[4] the instructions to the captain or pilot of the vessel, there is adequate information before the Court to find the instructions were relayed to the other crewmembers and that they all were sufficiently aware they were being questioned by counsel so that IMS could obtain legal advice from counsel with regard to the September 23rd incident. Additionally, there is more than adequate information before the Court to conclude that the each of the confidential communications made to counsel concerned matters within the scope of the crewmember's duties. Furthermore, counsel for IMS has taken appropriate

---

4 It is not clear from the information before the Court whether IMS communicated by radio or telephone. What is important is that IMS conveyed the instructions to the vessel's captain or pilot who then notified the rest of the crewmembers.

steps to keep these communications confidential. Therefore, the Court concludes that the recorded crewmember statements are subject to the attorney-client privilege and must be protected against compelled disclosure.

The Court does not find TVA's waiver argument persuasive because TVA has been accorded an adequate opportunity to challenge IMS's claim of attorney-client privilege. In making this finding, the Court notes that IMS raised the claim and made a proffer in support of it during the in-person hearing. Following the hearing, IMS filed an amended privilege log asserting the claim and memoranda effectively explaining the basis for making the claim. TVA had a more than an adequate opportunity to challenge the claim during the in-person hearing and in its post-hearing memoranda. Furthermore, the Court conducted an *in camera* review of the recorded statements before ruling on TVA's motion to compel.

The remainder of TVA's objections are without merit because the Court has found that IMS satisfied its burden of demonstrating that the recorded statements are subject to the attorney-client privilege. Moreover, contrary to TVA's assertion, there is enough information before the Court to conclude that the crewmembers were "sufficiently aware" that they were being questioned in order for IMS to obtain legal advice from counsel. *See* Upjohn, 449 U.S. at 394. As explained above, that requirement has been satisfied by IMS.

The Court's decision that the recorded crewmember statements are covered by the attorney-client privilege disposes of the need to address the parties' arguments on the question of whether the statements are subject to the work product doctrine.

ORDER

**IT IS HEREBY ORDERED** that TVA's motion for an order directing IMS to produce the recorded crewmember statements is **DENIED**.

Copies:     Counsel